[736 NYS2d 342]

In the Matter of John Buric, Petitioner, v Howard Safir, as Police Commissioner of the City of New York, et al., Respondents.

First Department, January 17, 2002

APPEARANCES OF COUNSEL

*Kenneth E. Gordon* of counsel, New York City (*James M. Thayer* on the brief; *Gordon, Gordon & Schnapp, P. C.,* attorneys), for petitioner.

*Susan Choi-Hausman* of counsel, New York City (*Barry P. Schwartz* on the brief; *Michael D. Hess, Corporation Counsel* of New York City, attorney), for respondents.

## OPINION OF THE COURT

LERNER, J.

Petitioner is a veteran police officer who was appointed on January 25, 1982. He had previously been an auxiliary police officer and had been dismissed for cause in May 1977. Petitioner challenged this dismissal in a CPLR article 78 proceeding (*Buric v McGuire*, Sup Ct, NY County, 1978, Riccobono, J., index No. 5577/78), which resulted in petitioner's reinstatement. On April 22, 1983 petitioner was dismissed from the Police Department on grounds of unsuitable character and prior unsatisfactory public employment predicated upon the prior dismissal from the auxiliary police force. Petitioner then appealed to the Civil Service Commission, which reversed the decision and ordered that petitioner be reinstated with back pay, noting that his prior problem as an auxiliary police officer was a result of his youth and inexperience. The Commission also found that after graduation from the academy petitioner served "with distinction" as a police officer and also noted that he had no "problems of any kind." The Police Department appealed and petitioner cross-appealed to compel reinstatement. By order entered April 15, 1985, Justice Edward Greenfield dismissed the petition and upheld the Commission's decision to reinstate petitioner. The Police Department again appealed to this Court which affirmed (*Matter of Ward v Civil Serv. Commn.*, 117 AD2d 1026).

Petitioner was reinstated on April 9, 1986 and was directed to sign an acknowledgment that he had to complete three more months of his probationary period. After initially refusing to sign and again being dismissed, petitioner did sign and was formally reinstated on April 14, 1986. Despite the fact that petitioner had completed all of his medical and psychological tests, he was ordered to repeat them.

Four days after petitioner's stillborn son was buried, he was required to undergo a psychological examination. Although still obviously bereaved, he was denied his request for a brief adjournment. The psychologist found him psychologically unfit and since he was still on probation (having been compelled to sign the extension), he was terminated without formal charges, prior notice, or a hearing.

Petitioner then moved to hold respondent Police Department in contempt for violating the prior court-ordered reinstatement. The issue was referred to a Special Referee who held a hearing and concluded that respondent Police Department had "willfully failed to comply with the order directing that Buric be reinstated to the Police Department." The Special Referee noted that the Department never really reinstated him and improperly revisited the grounds for his prior terminations. The Special Referee also noted that it would be normal for petitioner to be depressed when he had buried his child only four days earlier and, significantly, questioned the timing of the examination.

The court (Edward Greenfield, J.), by order entered April 8, 1991, confirmed the recommendations of the Special Referee, held respondent in contempt and ordered a trial to assess damages and back pay. That order was affirmed by this Court after respondent again appealed (*Matter of Ward v Buric*, 176 AD2d 571).

Petitioner was finally reinstated in January 1992. On April 4, 1997, petitioner was again suspended and subsequently terminated after being found guilty of using excessive force against a prisoner, removing said prisoner from his cell without authorization, and making a false statement by denying he beat the prisoner. This incident gave rise to the matter now at issue.

A hearing was conducted on September 14, 1998, at which one John Dunham testified that he was physically assaulted by petitioner on April 2, 1997 at 12:30 A.M. Dunham had been in a holding cell after being arrested at a McDonald's restaurant where he had pointed a gun at an employee and had falsely claimed to be a police officer. The testimony elicited from Dunham also established that he is a "police buff" and receives Social Security disability payments as a result of his being "mentally unstable."

Dunham testified to calling out to petitioner, "Don't I know you from somewhere?", after which a confrontation ensued and petitioner grabbed him by the neck, slammed his head against the cell bars and hit him on the head several times with his fist. He also alleged that another police officer then told petitioner "You can't do that in here * * * Take him to the back," after which petitioner removed him to the back of the precinct and continued to beat him. Dunham also alleged that three or four other officers observed the beating and told petitioner to stop but that petitioner then argued with the other officers and even struck one of them. Noteworthy is the

fact that no officers have been charged with covering up the incident nor was petitioner charged with striking a fellow officer.

At his initial interview, Dunham testified that the beating lasted for 20 minutes. At the hearing, however, he testified that the beating took 10 minutes. He stated that he reduced the time from 20 minutes to 10 minutes after an Internal Affairs Bureau (hereinafter IAB) officer told him it could not have been 20 minutes. The transcript is instructive in the manner in which the IAB officer coached Dunham into changing his account from 20 minutes to what appeared to the IAB officer to be a more reasonable scenario of 10 minutes:

> "DUNHAM: After 20 minutes was up * * * [Interrupted]
>
> "IAB OFFICER: Whoa, whoa, Time out. Time out. Okay. Lets get * * * Let's get a good time frame here. This officer took you in the room and he began hitting you, okay. There's no way he hit you for 20 minutes. If he * * *
>
> "DUNHAM: It was 20 minutes
>
> "IAB OFFICER: No. No. No. You'd be dead if he hit you. If I hit you for five minutes, you'd be dead."

When presented with these questions on cross-examination, Dunham changed his testimony from "20 to 10 minutes." He also testified that the beating was unprovoked and he smelled alcohol on petitioner's breath. He eventually went to Lincoln Hospital where he was observed to have two or three scratches and a swollen nose, suggesting that the IAB officer's concern over the 20-minute scenario was not misplaced, particularly in view of Dunham's account of being slammed against the metal cell bars and a sink.

Dunham's testimony was corroborated by Yvette Fwilo, who was allegedly handcuffed to another woman in a cell adjacent to that of Mr. Dunham's. She testified to observing Dunham being grabbed by the hair, punched, kicked, and thrown against the cell gate and wall. She observed him being removed from the cell for five or seven minutes and then being returned with blood running down his face, "pretty badly beaten up."

While Ms. Fwilo claimed she was brought into the precinct between 9:30 and 10:00 P.M. on the night in question, the precinct log established that she was not brought into the precinct until 12:05 A.M. and could not have been in the cell at the time the incident allegedly occurred.

Lieutenant Mark Porter testified that he was the precinct commander and entered the bathroom at about 12:15 or 12:20

A.M. and found Dunham telling another officer, Mejia, that he had been assaulted by petitioner in the bathroom. He never claimed he was assaulted in the cell. Lieutenant Porter, while observing some abrasions on Dunham's face, said there was no blood or any other indication of a fight in the bathroom. He had not come to the bathroom in response to a problem, but only to use it himself. When he questioned petitioner, he found him to be fit for duty, not in any disarray, and with no smell of alcohol on his breath.

Police Officer Milko Mejia testified that he entered the holding area at about 12:16 A.M. to secure some prisoners, heard Dunham say to petitioner "I know you," observed petitioner open the cell and heard a smacking sound. He later noticed that neither petitioner nor Dunham was in the cell. He then went to use the bathroom but was unable to do so because it was occupied by a prisoner with a slight injury to his forehead accompanied by Police Officer Sanchez. When asked if he knew whether petitioner slapped the prisoner Mejia responded, "Just my assumption that either the prisoner struck Officer Buric or Officer Buric struck the prisoner." He stated that there was no smell of alcohol on petitioner's breath.

Detective Joseph Wilson testified that he was the IAB officer who investigated the Dunham allegations concerning petitioner. He confirmed interviewing Yvette Fwilo over the phone, stated that he did not question her concerning her recitation of facts which according to the precinct log occurred before she arrived at the holding cell, and stated he did not show a photo array to any eyewitnesses in the case despite Dunham's allegation that there were several members of the department inside the room when he was allegedly assaulted. Wilson was asked whether he investigated Dunham's other allegations that members of the force asked Dunham to cooperate in covering up the incident and that Dunham said "this can't be buried because this guy has alcohol on his breath."

Wilson also confirmed that in his report he recited as part of petitioner's disciplinary record that petitioner has a history of litigating his way back on the job. Wilson obviously was referring to the matters described above which had transpired years ago when petitioner was first appointed in 1982 and for some time thereafter. When Wilson was asked why this was included in the report since it had no bearing on the incident, Wilson stated that he was told to include it by his commanding officer. Wilson also admitted in a conversation with the examining doctor that he suggested to the doctor "that some people just shouldn't be on this job." Wilson then admitted that he was referring to petitioner. Wilson also admitted not including in

his report the statement of Captain King that King found petitioner fit for duty when King observed petitioner shortly after the incident and that there was no presence of alcohol on petitioner's breath. Detective Wilson, in fact, concluded that based upon his investigation, Officer Buric was not intoxicated on April 2, 1997 and did not have alcohol on his breath. This fact, however, was not included in his report.

Detective Wilson also admitted to assisting Mr. Dunham in changing his testimony regarding the time frame of the alleged beating. Wilson also testified to receiving information from another police officer relating to Dunham's involvement in "phony" 911 calls. Dunham would call 911 saying there was a man with a gun in certain locations. When police would arrive, Dunham threatened the officers, telling them he was working with Internal Affairs. Dunham admitted this to Wilson in a conversation Wilson received from the police officer. Wilson admitted that this was the only interview with Dunham which he did not tape record.

Wilson also admitted during cross-examination that another "eyewitness," Benjamin Smalls, who had given a statement corroborating the incident, had been removed from the 44th Precinct before midnight and, therefore, Smalls could not have been present when this incident took place. Wilson also confirmed that a second "eyewitness," Owen Henson, had also been removed from the precinct prior to the incident concerning which he had given testimony. Detective Wilson also indicated that both of these "eyewitnesses" gave accounts of the incident which were substantially different from that of Mr. Dunham and other witnesses.

Testimony was elicited from Police Officer Edward Vargas, the arresting officer in the Smalls and Henson cases, that his prisoners, the two purported eyewitnesses, were, in fact, removed from the precinct and transported to Central Booking before midnight and thus could not have been present at the time of the subject occurrence. The inescapable conclusion is that their testimony was fabricated. The record is bereft of any suggestion that any of this tailored testimony was ever investigated. It was simply accepted, as was all other testimony including that of the first "eyewitness," Yvette Fwilo, who had not even arrived at the adjoining cell until after the alleged incident occurred.

Petitioner's 17-year-old daughter testified to a difficult father-daughter relationship beginning five years earlier when her mother died. She resented her father's discipline and testified to his displeasure over her staying out at night and spending

time with "bad people." At one point she filed an abuse complaint which she admittedly testified was "a false complaint * * * so that my dad would be probably easier on me and things would change."

Sergeant Karen Carr testified to petitioner's competence and that she saw him on the night of this incident, that she did not smell alcohol on his breath and that he proceeded with his tasks in a routine manner. She heard no cries from the cell area. She testified that petitioner neither asked for nor received permission to remove a prisoner from the cells. Petitioner concedes it was an error to have done so.

Police Officer Raymond Sanchez testified that he entered the men's bathroom at a time when petitioner, who appeared disheveled was backing out of it. Petitioner told Sanchez that he had been attacked by the prisoner, Dunham, whom he heard "yelling, 'I'm a fucking MOS'"(Member of Service). Sanchez observed that Dunham "was ranting and raving," that Dunham was told to sit down and relax, that Dunham was not handcuffed or otherwise restrained in any other manner nor did Sanchez ever see petitioner strike Dunham or use racist language. Sanchez denied that petitioner struck him or Officer O'Keefe and denied having to separate Officer O'Keefe from the petitioner.

Captain Thomas King testified that Lieutenant Porter entered his office and told him a prisoner had alleged being removed from the cells and beaten by a police officer. King stated that Mr. Dunham told King that he had spoken to petitioner, telling petitioner that he (Dunham) knew petitioner, whereupon petitioner opened the cell, took Dunham to the bathroom and started hitting him, that Dunham never claimed to have been beaten in the cells, was angry and agitated and had a small cut on his forehead and some redness on his face.

When Captain King advised petitioner of Dunham's charges, petitioner admitted to removing Dunham from the cells after Dunham threatened him, but petitioner insisted that he only struck Dunham in a defensive manner when Dunham attacked him while petitioner was trying to restrain Dunham. Although Dunham had claimed petitioner was drunk, the captain determined that this was not so and that petitioner was fit for duty. In view of the allegations, King advised IAB of the situation and recommended charging petitioner with inappropriately taking a prisoner out of the cell which petitioner admitted he had done.

Police Officer Arthur Doyle was assigned to guard Mr. Dunham at Lincoln Hospital. Doyle described Dunham as agi-

tated and belligerent. Dunham was wearing a bulletproof vest designed to look like a police officer's with NYPD patches on it. Dunham also had a bail bondsman's card and a fake shield on his person.

Headley Deacon, a manager of McDonald's, testified to the incident which resulted in Dunham's arrest. Deacon claimed Dunham screamed every time he was in the restaurant that he was being disrespected. This time Dunham took out a badge, pulled a gun and threatened Deacon that he would "leave a bullet in your fucking head." Prior thereto Mr. Deacon had called 911, but Dunham left before the officers arrived.

Mr. William Iton, another McDonald's manager, verified Mr. Deacon's account but added that he (Iton) had been a police officer in Antigua and he recognized the gun Mr. Dunham was carrying to be a nine-millimeter. When Dunham was apprehended he no longer had the gun but the officers did find handcuffs on his person.

Petitioner testified on his own behalf, admitting that he had removed Dunham from the cell, but denying any assault upon him. Petitioner stated he removed Dunham when the prisoner told him that he recognized petitioner and was going to get petitioner's kids, that Dunham knew where petitioner lived, knew where his kids hung out, and that "I'm going to kill your kids." Petitioner became upset and frightened because he had been having problems with his daughter and the company she was keeping. Petitioner also knew that prisoners often acted belligerent and tough in front of other prisoners and he believed he could have a more rational discussion with Dunham outside the cell area.

Petitioner testified that when they got to the muster room, petitioner released Dunham, who immediately became more belligerent and assumed a boxing stance. Petitioner realized he had made a mistake in removing Dunham and focused on getting Dunham back to the cell as soon as possible. A brief scuffle ensued and petitioner was able to push Dunham into the men's bathroom. When Officers Sanchez and O'Keefe arrived, Dunham was still in the bathroom screaming that he was related to a cop and was an MOS.

Petitioner denied striking Dunham except in self-defense and denied using any racial epithets. He denied banging Dunham's head against the bars. If he had done so, petitioner claims, Dunham's head would have evidenced far more serious injuries than the minor ones he displayed.

The hearing examiner found petitioner's story implausible and in conflict with the versions of other purported eyewit-

nesses, totally ignoring the evidence that three of these witnesses were not even present when the incidents they were relating had taken place. The hearing officer chose to overlook the evidence of Detective Wilson's coaching Dunham and producing witnesses to the event whom he would have every reason to believe were not present at the time of the alleged occurrence. The record clearly supports petitioner's contention that a pattern of retaliation was amply demonstrated and that respondent's determination was not supported by substantial evidence.

The instant article 78 proceeding was commenced on August 19, 1999 seeking reinstatement, back pay and damages. The first four causes of action asserted claims under 42 USC § 1983. The first cause of action alleged that respondents found petitioner guilty of charges of which they knew or should have known he was innocent in retaliation for his exercise of the right to petition guaranteed by the First and Fourteenth Amendments to the United States Constitution. The protected conduct in the petition was petitioner's prior successful article 78 proceedings contesting his prior dismissals as well as his appeal in 1983 to the Commission. In a decision and order dated December 13, 1999, the Supreme Court transferred this proceeding to this Court.

It is well settled that where the determination of an administrative agency is supported by substantial evidence in the record such finding will not ordinarily be set aside (*Matter of Pell v Board of Educ.*, 34 NY2d 222, 230-231; *Matter of Purdy v Kreisberg*, 47 NY2d 354, 358). An administrative agency's determination will be found to have been supported by substantial evidence where there is a rational basis for such finding in the record as a whole (*300 Gramatan Ave. Assocs. v State Div. of Human Rights*, 45 NY2d 176, 180; *Matter of Gonzales v LeFevre*, 105 AD2d 909, 910).

While the threshold required to annul the Commissioner's determination is a very high one, the Commissioner's findings in this case clearly demonstrate, on this record, the lack of any rational basis.

The hearing examiner based her decision on the testimony of Mr. Dunham and the allegedly corroborating testimony of Ms. Fwilo, Mr. Smalls and Mr. Henson. Mr. Dunham, however, told different stories to different people. At the hearing he testified to being beaten in the cell and in the bathroom. On the night of the incident, he told Lieutenant Porter and Captain

King (in two separate interviews) that he was only assaulted in the bathroom. The testimony of the three "corroborating witnesses" was incredible since none of them were present in the cells at the time this incident was alleged to have occurred. While Ms. Fwilo claimed that she entered the precinct at 9:30 or 10:00 P.M. and spoke to Mr. Dunham for 10 to 15 minutes, the precinct log clearly established that she was not even brought into the precinct until 12:05 A.M. The entry procedures, thus, made it impossible for her to have been placed in the cells by the time the incident allegedly occurred. She also failed to identify petitioner at the hearing.

Smalls and Henson claimed they were in the cells at the time of the incident. Officer Vargas, however, testified that they were both in transport vehicles on their way to Central Booking at 11:45 P.M., well before the incident allegedly occurred. Presumably Detective Wilson knew of these anomalies. Their accounts, in any event, differed significantly from Mr. Dunham's testimony.

Incredibly, the hearing examiner ignored all of these key details in her decision, instead lauding the credibility of Mr. Dunham, Ms. Fwilo, Mr. Smalls and Mr. Henson.

This record, when viewed as a whole, fails to support the determination (*Matter of Mobley v Tax Appeals Tribunal*, 177 AD2d 797, *appeal dismissed* 79 NY2d 978). Accordingly, the Commissioner's determination which found petitioner guilty of assault and lying as set forth in specifications 1 and 3, is hereby annulled.

Inasmuch as petitioner admitted to specification 2, to wit, removing a prisoner from the cell without permission, it is necessary to remand for a further hearing as to an appropriate sanction for this infraction.

It will also be necessary to remand the matter to the Supreme Court in order to make a determination on the issue of petitioner's 42 USC § 1983 claims inasmuch as these claims were raised for the first tme in the petition. Moreover, given the evidence of bias in the record, it is more appropriate for the Supreme Court to conduct a hearing on the issue of retaliation, rather than respondent, which is accused of retaliatory conduct.

In order to make a finding of retaliation, petitioner is required to establish (1) that he engaged in conduct protected by the First Amendment and (2) that this conduct was a substantial or motivating factor in respondents' actions (*Mt. Healthy City School Dist. Bd. of Educ. v Doyle*, 429 US 274).

Petitioner's litigations are protected actions under the First Amendment, regardless of whether they addressed an issue of public concern (*San Filippo v Bongiovanni*, 30 F3d 424, *cert denied* 513 US 1082). Thus, as conceded by respondents, petitioner's prior litigation is a protected action which was demonstrably necessary to preserve his rights as previously found by this Court (*Ward v Civil Serv. Commn.*, *supra; Ward v Buric*, *supra*).

Under the circumstances, viable issues exist as to whether petitioner's prior successful litigation was a substantial or motivating factor in respondent's decision to find petitioner guilty of the various charges and to then terminate him, doing so in the face of overwhelming evidence indicating the use of tailored as well as tainted testimony.

Significant evidence of bias is apparent in the record, most notably by Detective Wilson who stated in his report that petitioner "litigate[d] his way back on the job" and indicated that he thought petitioner was not fit to be a police officer. Moreover, according to Detective Wilson, this statement was included in his report at the direction of his commanding officer.

Detective Wilson admitted that he knew the precinct logs established that Ms. Fwilo had not entered the precinct until 12:05 A.M. Wilson admitted never having questioned Ms. Fwilo about this apparent inconsistency. Wilson further chose to overlook the fact that Mr. Smalls and Mr. Henson had already been removed from the precinct at the time of the alleged incident. Moreover, Detective Wilson admitted to coaching Mr. Dunham as to the amount of time he was allegedly beaten.

Detective Wilson admitted to making no search for other witnesses despite the testimony of Mr. Dunham, Ms. Fwilo, Mr. Smalls and Mr. Henson that there were other officers who saw the incident, were involved in it, and attempted to persuade Mr. Dunham not to file a complaint. No search was made, no photos were shown to them. Instead Detective Wilson focused his investigation solely on the purported actions of petitioner.

Detective Wilson also stated, incorrectly, in his report that two officers pulled petitioner off Mr. Dunham. The record is abundantly clear that this simply did not occur. Wilson also stated that petitioner was unfit for duty at the time of the incident and had alcohol on his breath. Every other witness, including Captain King, testified that these allegations were untrue, and that petitioner was, as a matter of fact, fit for duty with no discernible odor of alcohol on his breath.

Although the detective taped every other interview with Mr. Dunham, he failed to tape the one interview in which Mr. Dunham admitted to making false 911 calls; nor did he include this information in his report. He also failed to investigate Dunham's claims that he was an "MOS" (Member of Service) and was related to Officer Carre or Dunham's prior impersonations of others. In short, Detective Wilson's actions, when taken as a whole, evince a pattern so calculated as to be indicative of retaliation.

Accordingly, in this proceeding brought pursuant to article 78 of the Civil Practice Law and Rules (transferred to this Court by order of the Supreme Court, New York County [Michael Stallman, J.], entered December 17, 1999), the determination of the respondent Commissioner, dated April 22, 1999, finding petitioner guilty of three specifications and dismissing him from employment, should be modified so as to annul the guilty findings as to specifications 1 and 3 regarding petitioner's use of excessive force and making a false statement regarding same, and otherwise confirmed, without costs, and the administrative matter remanded to respondent for imposition of an appropriate lesser penalty on specification two and the matter insofar as it pertains to the causes of action under 42 USC § 1983 remanded to the Supreme Court, New York County, for further proceedings.

WILLIAMS, J. P., SAXE, RUBIN and BUCKLEY, JJ., concur.

In this proceeding brought pursuant to article 78 of the Civil Practice Law and Rules, the determination of respondent Commissioner dated April 22, 1999, is modified, so as to annul the guilty findings as to specifications 1 and 3 regarding petitioner's use of excessive force and making a false statement regarding same, and otherwise confirmed, without costs, and the administrative matter remanded to respondent for imposition of an appropriate lesser penalty on specification two and the matter insofar as it pertains to the causes of action under 42 USC § 1983 remanded to the Supreme Court, New York County, for further proceedings.

Reargument granted and, upon reargument, the unpublished decision and order of this Court entered on August 30, 2001 (Appeal No. 4322) is recalled and vacated and a new decision and order substituted therefor. Leave to appeal to the Court of Appeals denied.